**STATE OF ILLINOIS, et al., Plaintiffs,**

v.

**BORG, INC., et al., Defendants.**

No. 79 C 5253.

United States District Court,
N.D. Illinois, E.D.

Dec. 6, 1982.

Patrick W. O'Brien, Asst. Atty. Gen., Chicago, Ill., Tyrone C. Fahner, Atty. Gen., Springfield, Ill., for plaintiffs.

Michael A. Forti, Bell, Boyd & Lloyd, Chicago, Ill., for defendants.

---

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This is one of three class actions[1] charging 22 piping construction companies and 36 individuals with bid-rigging, price fixing and job allocation in the Chicago area from 1956 to 1977 in violation of the Sherman Act. As a result of information learned during the course of the litigation, the State of Illinois ("Illinois") has moved to disqualify attorney Edwin C. Thomas ("Thomas") and his law firm Bell, Boyd & Lloyd ("Bell Boyd") from further participation in Illinois' action.[2] For the reasons stated in this memorandum opinion and order Illinois' motion is granted.

### Background

One of the many previous motions in these actions was defendants' seeking summary judgment because limitations allegedly barred all pre-January 31, 1975 claims by Illinois. *See* 94 F.R.D. 300 (N.D.Ill.1982). Illinois responded the statute of limitations had been tolled until Illinois actually discovered defendants' alleged wrongs. But defendants contended Illinois had actual or constructive knowledge before January 31, 1975 of facts suggesting the existence of its claims. Such knowledge, if established as a' matter of law, would have defeated Illinois' effort to reach back of the limitations period. This Court found defendants had not established Illinois' knowledge beyond factual dispute (94 F.R.D. at 302–03, emphasis in original, footnote and citations omitted):

> What defendants have rather done is to offer bits and pieces of evidence purportedly showing Illinois had "direct knowledge of facts supporting its claim long before the January 31, 1975 limitation date." ... But those bits and pieces do not prove *as a matter of law* even "constructive" knowledge on Illinois' part—they were not enough *as a matter of law* to "have aroused suspicion or curiosity on the part of plaintiff" as to the wrongs asserted in the Complaint. That is so because almost without exception the evidence adduced by defendants really involves bid-rigging conspiracies by mechanical contractors in downstate Illinois, not in the Chicago area with which Illinois' Complaint is exclusively concerned....
>
> ... No demonstration that Illinois knew about bid-rigging among principally downstate contractors and on downstate projects can establish the necessary "suggestion" as to the present defendants and their Chicago projects as a matter of law. Nor can one-sentence references to one Chicago project or to rumors of statewide illegality bear the weight defendants seek to place on them. It must be remembered that on the present motion all reasonable factual inferences are drawn in favor of Illinois and not defendants.

For purposes of their summary judgment motion defendants sought to assimilate downstate bid-rigging to Chicago bid-rigging. Illinois urged the two matters were entirely separate, so its extensive earlier investigation of the downstate conspiracy would not imply pre-1975 knowledge of any Chicago conspiracies. On the present motion, the parties have virtually traded positions.[3]

Illinois is spurred to that exchange by the fact Thomas directed the downstate investi-

---

1. 79 C 3046 and 79 C 3077 are fully consolidated. 79 C 5253 is consolidated for discovery purposes only.

2. Thomas and Bell Boyd represent defendants Elmer Bruksch ("Bruksch") and Economy Mechanical Industries ("Economy Mechanical") (collectively "Economy," treated in the singular simply to avoid awkwardness in locution). Economy has argued (Ans. Mem. 6 n. 5) the disqualification motion applies only to Illinois' case, 79 C 5253. Illinois' reply memorandum has not contested that position.

3. Illinois' earlier argument that it was ignorant of any Chicago-area conspiracies was consistent with its Complaint ¶ 28 allegation of defendants' "fraudulent concealment." Thus, Illinois' turnabout is responsive to defendants' summary judgment contention, while Economy's present position reflects an attempt to avoid the possible consequences of defendants' own prior arguments.

gation and related antitrust litigation as an Assistant Illinois Attorney General from 1970 to 1977 or 1978.[4] More precisely, Illinois' present motion was triggered by defendants' use of Thomas' former position and activities as an important part of defendants' "bits and pieces" to evidence Illinois' pre-1975 knowledge of facts suggesting *Chicago* area bid-rigging.[5] Defendants' summary judgment motion argument on Thomas' implicit role as a conduit of knowledge has come home to roost as Illinois' argument for Thomas' disqualification.

In particular, on the summary judgment motion defendants argued (Mem. 6; R. Mem. 20–22) the downstate investigation conducted by Thomas provided Illinois with knowledge of Chicago-area bid-rigging before January 1975. What is more important,[6] Thomas' own deposition testimony admitted he learned of possible (or even probable) Chicago bid-rigging during his downstate investigation in the early 1970's (Dep. 51, 55, 58, 74–77, 82–84, 88–90, 98–99, 210–12, 215–16), and he explained Illinois' failure to act then on that knowledge as the result of a conscious policy of inaction (Dep. 67–68, 70, 104, 113–14, 179, 182–83). That explanation of inaction was sought to be used to turn Illinois' ostensible ignorance of *specific* Chicago-area conspiracies into collateral "proof" of Illinois' knowledge of the *general* existence of such conspiracies. In any case, Thomas himself connected his prior public duties to the Chicago-area bid-rigging that is the subject of these consolidated actions.

### Disqualification: Legal Principles

Our Court of Appeals has adopted the "clearly settled" legal test in disqualification matters:

> [W]here an attorney represents a party in a matter in which the adverse party is that attorney's former client, the attorney will be disqualified if the subject matter of the two representations are "substantially related."

*Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223 (7th Cir.1978) ("*Westinghouse II*"). See also *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1322 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978) ("*Westinghouse I*"). That test embodies the substance of Canons 4 and 9 of the (1978) ABA Code of Professional Responsibility (the "Code").[7] Contrary to Economy's assertion (Ans. Mem. 8), the con-

---

4. No dispute exists as to Thomas' downstate public service in the 1970's. Pl. Mem. 4–6; Def. Ans. Mem. 3–5. There is some indefiniteness (irrelevant for current purposes) as to the date Thomas' work for the Attorney General's Office terminated, because he served as a special assistant on a case that continued beyond his tenure with that office.

5. Illinois deposed Thomas after defendants cited the prior Illinois investigation as the source of Illinois' knowledge of Chicago-area claims. Pl. Mem. 2. In his deposition Thomas admitted documents he authored were relied on in defendants' summary judgment briefs. Dep. 38–40. Because the disqualification issue arose from the summary judgment briefs and arguments, Economy cannot successfully assert (Ans. Mem. 9–10) Illinois waived its right to object to Thomas' representation by waiting two years to act, although Illinois knew from the start Thomas had been its chief investigating attorney on the downstate matter.

6. Economy contends (Ans. Mem. 2 n. 1):
   In addition to its untimely and strangely contradictory aspects, the motion is curious from a substantive standpoint. It is apparently premised on the notion that mere arguments advanced by certain defense lawyers in connection with the fraudulent concealment controversy, which were rejected by the Court in its memorandum opinion, provide sufficient grounds for the extreme sanction of disqualification.

   As the text of this opinion reflects, analysis of the problem properly focuses on what *Thomas* has said—sworn testimony about which Economy's memorandum is wholly silent—not just on what other defense lawyers have argued.

7. Canon 4 provides "A lawyer should preserve the confidences and secrets of a client." Canon 9 provides "A lawyer should avoid even the appearance of professional impropriety." As the text discussion will confirm, this case poses problems in terms of a specific Disciplinary Rule ("DR") under Canon 9, so that the troublesome prospect of using that Canon as a catchall source of disqualification whenever a court intuitively feels something is amiss (see Shadur, *Lawyers' Conflicts of Interest: An Overview,* 58 Chi.B.Rec. 190, 192–94 (1977)) is not presented here.

cerns of Canon 4 are necessarily implicated when a party seeks disqualification under Canon 9, as Illinois does here. *See Westinghouse II,* 588 F.2d at 224.

Illinois urges Thomas should now be disqualified because his continued participation in this action would violate DR 9–101(B):

A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

DR 9–101(B) reflects the Code's general concerns underlying disqualification and applies them to the special case of former government attorneys. *See General Motors Corp. v. City of New York,* 501 F.2d 639, 648–49 (2d Cir.1974).

As n. 4 and its accompanying text reflect, Thomas indisputably had "substantial responsibility" over all aspects of Illinois' investigation of downstate bid-rigging in the 1970's. Thus the *Westinghouse*-defined question becomes whether there is a "substantial relationship" between the "matter" of this action and the "matter" over which Thomas exercised public responsibility. *Westinghouse II* mandates a three-part analysis of that issue (588 F.2d at 225):

Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

Were it not for the statute-of-limitations/fraudulent-concealment issue in this action, the relevant inquiry into the "matter" of Thomas' prior public representation

(its "scope" in *Westinghouse II* terms) would be narrower. Then the sole question might be whether Thomas learned, while a public official, of possible Chicago-area conspiracies involving Economy (they are after all his present clients). In fact Thomas' testimony (Dep. 99) suggested he had received at least some such information in December 1970. But in that case, the fact Thomas had opted not to involve Illinois (or himself) in Chicago matters might then negate the inference he actually delved into the Economy "matter" as a public employee.[8]

However, Illinois' fraudulent concealment claim has broadened any such possibly limited perception of the relevant "matter" within the scope of Thomas' prior public representation. Defendants countered Illinois' claim by alleging Illinois had knowledge of pre-1975 Chicago-area bid-rigging. Although this Court held (94 F.R.D. at 302) Illinois' knowledge had not been established as a matter of law (after inferences were drawn in Illinois' favor), that factual issue remains open in this action. *See* 94 F.R.D. at 303 n. 5. Economy's contrary assertion (Ans. Mem. 2 n. 1, 19) is simply wrong.

Moreover, Thomas himself has acknowledged his central role in sifting the information garnered in the downstate investigation and in determining what "leads" would and would not be pursued. Such activities establish Thomas' clear professional involvement in the very "matters" at issue in the current dispute over defendants' alleged concealment and Illinois' alleged knowledge.

Thomas' admittedly key role in Illinois' downstate investigation makes it "reasonable to infer" Thomas was privy to Illinois' confidences on these matters,[9] so the second part of the Court of Appeals' analysis poses

---

8. On the other hand, Thomas' *failure* to act if he were under a duty to do so might itself raise the appearance of impropriety in his present representation. *See General Motors,* 501 F.2d at 648–49. For the reasons discussed in the text, that possible variant of the problem need not be resolved here.

9. This is really an understatement. Thomas' function in running the investigation for his client (Illinois) made *him* the source of any potential confidences and secrets to be furnished the *client*—the obverse of the usual lawyer-client relationship.

no difficulty.[10] Finally, Thomas himself has admitted (Dep. 29) Economy may benefit substantially if Illinois' pre-1975 claims are barred, and so the third part of the analysis is satisfied. Thomas' information is clearly relevant to a critical issue raised by Economy and other defendants against Illinois in this action.

Thus Thomas himself has established he had "substantial responsibility" as a public official over a "matter" at the core of the present litigation. It will not do for Economy to argue (Ans. Mem. 18–20) Thomas' downstate activities were unrelated to the Chicago-area matters in this litigation, for that position wholly ignores Thomas' deposition testimony and the relevance of defendants' defense to Illinois' fraudulent concealment claim. Thomas has placed himself in direct collision with DR 9–101(B)[11] by providing the nexus between his prior public duties and his present private representation. He has established the "striking similarity" between his former responsibilities as Illinois' lawyer and crucial issues in the present action. *See General Motors*, 501 F.2d at 649.

Because DR 9–101(B) is dispositive it is unnecessary to decide Illinois' independent claim that Thomas must withdraw from representation because of DR 5–102(A):

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the

circumstances enumerated in DR 5–101(B)(1) through (4).

Illinois argues (Mem. 15) Thomas "ought to be called as a witness" on the fraudulent concealment issue.

That contention cannot be resolved without inquiry into other related questions. For one thing DR 5–102(A) may well leave to the present client (Economy) the initial determination of who "ought to be called as a witness." *See J.D. Pflaumer, Inc. v. United States Department of Justice*, 465 F.Supp. 746, 747–48 (E.D.Pa.1979). Moreover, even if Thomas were a "pivotal" lawyer-witness whom defendants "ought to call" in some mandatory sense, *see MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1208–09 (S.D.N.Y.1981), DR 5–102(A) contains an escape clause allowing continued representation and testimony in cases of substantial hardship to a client. See Rule 5–101(B)(4). There is simply no point in reaching out to treat with issues that require further exploration, given the clear applicability of DR 9–101(B).

In sum Thomas must be disqualified from representation of Economy in this action because of the mandate of DR 9–101(B). No finding of deliberate professional misconduct is implied by this holding.

### Disqualification of Bell Boyd

Coupling strict enforcement of DR 9–101(B) with an automatic application of vicarious disqualification would turn many former government attorneys into professional pariahs. Courts have therefore struggled to find ways to balance the public interest in the integrity of the legal profession with fairness to former government

---

**10.** Thomas' position as the lawyer in charge, who later moved to a new firm, eliminates any possible issue about information passing from senior to junior members of a law firm or staff. Were that involved, the law would create a "rebuttable presumption" as to the free flow of information among lawyers so related. *See Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721–23 (7th Cir.1982); *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, 197 (7th Cir. 1979).

**11.** Economy argues in part (Ans. Mem. 15–16) as if Illinois were invoking only Canon 9 per se. Merely reading DR 9–101(B) demonstrates the invalidity of that position (and see n. 7). Thomas' admitted key personal responsibility, while a lawyer for Illinois, on matters related to Illinois' present litigation stance (in opposition to Thomas' present clients) distinguishes his situation from that of former United States Attorney Thomas Sullivan in *United States v. Dorfman*, 542 F.Supp. 402, 407 (N.D.Ill.1982).

employees and their new employers or partners. This is the world of "Chinese walls" and "rebuttable presumptions" about the flow of information within law firms. *See Kadish v. CFTC,* 548 F.Supp. 1030, 1034–35 (N.D.Ill.1982).

Once again the circumstance here is simpler. Thomas himself has established he served as a key Illinois lawyer on a matter substantially related to the present litigation. That representation carries with it the conclusive presumption of access to confidences and secrets, *Westinghouse II,* 588 F.2d at 224, a presumption confirmed in fact by Thomas' deposition testimony.[12]

In turn Thomas both presumptively and actually carried relevant Illinois confidences and secrets to Bell Boyd, even if his involvement in the present litigation developed gradually and innocently. *See* Sept. 7, 1982 Thomas Affidavit ¶¶ 6–9. And while it might have been possible *in the beginning* to insulate Thomas from his colleagues at Bell Boyd on the piping litigation matter, that opportunity has passed.[13] Quite to the contrary, Thomas has been an active litigator in this case for over two years, working with others in the firm. Firm disqualification is mandated. *See Westinghouse I,* 580 F.2d at 1321.

Any such belated disqualification is of course regrettable. But as this opinion's discussion makes plain, the timing flowed from defendants' own arguments and Thomas' own deposition on defendants' summary judgment motion.

### Conclusion

For the reasons stated Thomas and Bell Boyd are disqualified from further participation in this action (but not from the other actions consolidated for discovery purposes).

---

**12.** Confidences and secrets can comprise matters either beneficial or damaging to the former client. As already discussed, in this case Thomas knows the scope of Illinois' knowledge of possible or probable Chicago-area conspiracies. That information is sought to be used to Illinois' detriment and to the benefit of Economy (Thomas Dep. 29) among other defendants.

**13.** This Court has recently noted the presumption of transmission of confidences to a lawyer's new law firm is rebuttable. *Kadish,* 548 F.Supp. at 1036–37; *but cf. Freeman,* 689 F.2d at 723 n. 12 (implying an irrebuttable presumption of transmission within new firm). Of course, in Thomas' present situation it would be impossible to rebut the presumption in any event.